**SCHAEFER, Exr, et, Appellants, v. DEPARTMENT OF TAXATION OF OHIO, Appellee.**

Ohio Appeals, First District, Hamilton County.

No. 6488.   Decided June 4, 1945.

Charles H. Stephens, Jr., Cincinnati, for appellants.
Parker L. Snyder and Joseph F. Ford, for appellee.

## OPINION

By HILDEBRANT, P. J.

The Probate Court of Hamilton county, Ohio, included in the taxable estate of decedent all but one of six intervivos gifts of common stock of The Lunkenheimer Co., made over a period of years between 1920 and 1935 to her only son, and assessed the Ohio inheritance tax on the transfer thereof, as having been made in contemplation of death within the meaning of the Ohio statutes.

The appeal is on questions of law.

The Department of Taxation offered in evidence at the hearing on the exceptions filed in the Probate Court:

(1)  The appraisal proceedings in the Probate Court including the Order to Appraise, the itemized schedules showing the gifts involved, and the report and recapitulation thereof.

(2)  Exceptions to determination of inheritance tax filed on behalf of the Executor and individually by the only son.

(3)  Journal Entry determining tax after Auditor's Appraisal.

(4)  Application and Itemized statement of assets, and liabilities, to. be filed for determination of inheritance tax, listing the gifts involved and making the contention that none was subject to tax.

(5)  Last Will and Testament of Ella L. Schaefer, dated August 13, 1942.

The State then rested and no motion of any kind on behalf of exceptor was filed.

The exceptor testified himself and called as witnesses a niece of decedent, a friend of decedent, and the woman who had been housekeeper for decedent over a period of thirty-five years, who testified as to facts and circumstances relevant here.

Pertinent data as to the gifts is as follows:

| Date of Transfer | Age of Donor | No. of shares | Equiv. in pres. shares | Age of Donee | Monetary Value | Ages of Children |
|---|---|---|---|---|---|---|
| 5-27-1920 | 62 | 105 | 2100 | 38 | $ 44,100 | 4 to  9 |
| 12-31-1924 | 66 | 500 | 2000 | 42 | 42,000 | 8 to 13 |
| 12-31-1925 | 67 | 500 | 2000 | 43 | 42,000 | 9 to 14 |
| 12-18-1930 | 72 | 500 | 500 | 48 | 10,500 | 14 to 19 |
| 5-31-1933 | 75 | 1620 | 1620 | 51 | 34,020 | 17 to 22 |
| 12-23-1935 | 77 | 5000 | 5000 | 53 | 105,000 | 19 to 24 |

Ella L. Schaefer died  testate, a resident of Cincinnati, Hamilton County, Ohio, on August 23, 1943, at the age of 84 years. It is admitted that the gift or transfers were made without a valuable consideration in money or money's worth, the shares being common stock in the Lunkenheimer Company.

Decedent, by her last will and testament, dated August 13, 1942, devised her home and bequeathed certain personal effects to her son, H. Frederick Schaefer, 50 shares of preferred stock in the Lunkenheimer Company to each of her four grandchildren, and 50 shares of the same stock to her daughter-in-law, Martha W. Schaefer, the wife of the exceptor. Provisions were made for the payment of debts, funeral expenses and inheritance taxes on said bequests.  The rest and

residue of her estate was devised in trust to the son and The Central Trust Company of Cincinnati, one-half of the income being payable to the son for life and the other half to be paid in equal shares to said four children. On the death of the son, the trust was to terminate and the principal was to be divided equally among the four grandchildren. Further provision was made to take care of distribution in the event any of the grandchildren should die without issue before taking, not important here.

At the time of her decease the appraised gross value of her estate, including the above gifts, amounted to $834,951.39, but excluding said gifts, amounting to $277,620, the gross estate showed a value of $557,331. Debts and other expenses of the estate amounted to $153,651.80, consisting almost entirely of estimated Federal Estate Taxes and costs of administration, and the net estate, including the gifts, amounted to $681,299.59, and, excluding the gifts, $403,679.59. Based on these figures the decedent transferred to her son an amount in excess of 33 per cent of her gross estate, or in excess of 40 per cent of her net estate. With reference to the property in possession and enjoyment of decedent prior to death, the gifts amount to approximately 33-1/3 per cent thereof.

The Ohio statutes provide:

"**Sec. 5332.** A tax is hereby levied upon the succession to any property passing, in trust or otherwise, to or for the use of a person, institution or corporation, in the following cases:
\* \* \* \*

"3. When the succession is to property from a resident or to property within this state from a nonresident, by deed, grant, sale, assignment or gift, made without a valuable consideration substantially equivalent in money or money's worth to the full value of such property: .

"(a) In contemplation of the death of the grantor, vendor, assignor, or donor or \*\*\*\*"

"**Sec. 5331.** As used in this subdivision of this chapter:
\* \* \* \*

"5. 'Contemplation of death' means that expectation of death which actuates the mind of a person on the execution of his will."

The question presented for decision here is, whether or not the judgment of the Probate Court is correct in finding from the evidence before it that the Department of Taxation had sustained the burden of proving that all but one of the

said gifts were made in contemplation of death, as defined by the Ohio statute.

Our Supreme Court has said in **Tax Commission v. Parker, 117 Oh St 215,** in the fourth paragraph of the syllabus:

"The controlling fact in determing whether a transferor made the transfer of property in contemplation of death is whether the purpose of the transferor was to distribute or partially distribute his estate, or was simply to do an act of generosity or kindness."

Again, the Supreme Court has said in **In Re Estate of Robinson, 145 Oh St 55,** in the third paragraph of the syllabus:

"Whether the transfer of property was a distribution of the transferor's estate or an act of generosity or kindness is to be determined by all the facts and circumstances existing at the time of the transfer, and if multiple transfers were made, the facts and circumstances existing at the time of each transfer should be separately considered."

All the gifts in question here were made more than two years prior to the death of donor, so that the burden of proving that the gifts and transfers were in fact made in contemplation of death rests upon the Department of Taxation. In Re Estate of Robinson, supra, p. 59. It is by application of the statutory definition of the phrase "in contemplation of death" in the light of the Parker and Robinson decisions that the question as to the taxability of these inter vivos gifts is to be determined.

Pertinent facts about the donor and the circumstances under which she lived are:—

That she was a daughter of the founder of the Lunkenheimer Company and lived most of her life in her ancestral home, where she died in 1943, at 84 years of age. Widowed when her only son was a small boy, he lived with her until his marriage, when his home was established next door to hers, where he and his family, consisting of his wife and four children, continued to reside during her lifetime. Donor was a wealthy woman, whose estate consisted largely of intangibles, included therein being a large block of the preferred as well as the common stock of The Lunkenheimer Company, so that her income was substantially greater than her expenditures. It appears from the record that her primary, all-consuming interest in life centered upon her only son and his family. This natural and instinctive bond was no doubt stimulated

and strengthened by the years of widowhood, during which she and her son lived together, followed by the close, daily contacts resulting from his family home being established next door to her own. Donor was active in women's club affairs in the city, as well as in the artistic and cultural life therein, attending the Symphony Concerts, the theatre, and moving in her social circles, upon whose generosity and interest that phase of human endeavor so largely depends. During the years 1920 to 1935 she was well, active, directed her own household affairs, entertained and visited with her circle of friends and suffered no serious illness at any time. In 1942 a cold developed into pneumonia, which left her with a heart condition, which is the only evidence of illness in the record, and following which she executed her last will, dated August 13, 1942. There is evidence of a former will executed approximately five years before her death, but no evidence of its contents.

It appear that the donee had an ample estate of his own and during the period 1920 to 1935 his average income was estimated to be around $12,000 per year. For a number of years the donee was a Vice President of The Lunkenheimer Company, drawing a salary estimated at five or six thousand dollars per year.

About the year 1922, his services as an officer terminated, the record leaving an inference of a change in management incident to bad times for the company. From that time on, he has not been regularly employed as before.

The donee was in daily contact with donor performing many services connected with her daily household living and she depended on him to conduct the business of investing and reinvesting and managing her large estate of intangibles through contact with the business and finanacial world, thus relieving her of much arduous responsibility.

The testimony reflecting on motive for the gifts was as follows:

"HANS FREDERICK SCHAEFER.

Q. 30. Now coming to the time when these transfers of Lunkenheimer Co. stock were made to you, the first one in May 1920, and so on, what did you know as to your mother's ideas or reasons for making those transfers, as stated to you?

A. Well, she was particularly interested in the grandchildren, and she wanted them to have every advantage. We lived next door, quite a large family, a big house, and she just wanted to see that they were well cared for, and enjoying things.

Q. 31. How about yourself?

A. Well, I probably included myself in there.

Q. 32. What did you do for her from time to time, Fred?

A. Well, I tried to take care of, and do all I could for her in taking care of her matters, making investments for her, and things of that sort.

Q. 33. Did anybody else attend to any of her business affairs?

A. Well, I just acted as a go-between, you might say.

Q. 34. In a personal way, what did you do for her?

A. Well, I lived next door, and I would see her almost every day, and I did whatever I could for her.

Q. 35. Did you take care of seeing people about taking care of the place?

A. Yes, but of course, she was able to do that. She was very particular about such things.

Q. 36. Were the children in and out of the house every day?

A. Quite a bit, yes.

Q. 39. In a general way, how did it happen that you left the employ of the Lunkenheimer Co.?

A. Well, it was during a bad period, as I remember it, and they had all sorts of efficiency engineers, and I guess I was fired.

Q. 40. Did your mother know about that?

A. Oh yes, she knew about it; certainly.

Q. 41. Did she say anything to you about loss of salary, or anything of that kind?

A. I think it was her idea to try to make up for the loss of salary.

Q. 42. You had been getting from them, prior to that, quite a considerable salary?

A. Yes, but I don't just remember exactly what it was.

Q. 43. During all those years, and up to the time of your mother's death, how was her income with reference to her living expenses and her needs?

A. Well, it was more than enough.

Q. 44. Did she ever spend her income?

A. Never, No. She was always able to put some aside.

Q. 45. Do you recall anything further of what she said that she would like to do for you at the time these gifts were made?

A. Well, she probably wanted to see that the children

were provided for, and probably also wanted to make some remuneration to me for taking care of her affairs.

Q. 46. You were the only man in the family?

A. Well, yes; she had a brother living.

Q. 47. Just give the court an idea of the extent to which your mother relied on you for help.

A. Well, I was the only child, and I lived next door, and I did most of this from about 1916 on.

MR. FORD: Did most of what?

A. Watching her affairs. If any of her investments had to be sold, or in investing, if she had a surplus in bank, we would invest it. I would get good advice on that and consult her, and then it would be done.

Q. 48. State whether or not you kept her posted as to what went on in the Lunkenheimer Co.?

A. I tried to. Yes.

BY MR. FORD:

XQ. 6. None of these gifts were made to any other person?

A. None of these, No. There was some gift made, I think, in 1935, to the grandchildren.

XQ. 7. What was the nature of that gift?

A. Well, I don't just exactly remember; it was stock.

BY MR. STEPHENS:

Q. 49. Those were small, weren't they?

A. Yes.

Q. 50. I didn't know anything about that until after this was filed. That was preferred stock, wasn't it?

A. I think that was preferred stock.

BY MR. FORD:

XQ. 8. How many shares?

A. Oh, I don't remember.

XQ. 16. Now when she gave this first gift in 1920, do you recall any of the conversations, or any of the circumstances, that led up to that gift?

A. Oh, I don't remember.

XQ. 31. I want to ask you as to each of these gifts, and whether you can recall as to the time any of these gifts, and the conversations or circumstances which surrounded them, and as to why they were made?

A. They were made because it was necessary; the children had been going to private schools.

XQ. 32. You mean your children?

A. My children, yes; and then later on, to college, and the expenses were quite high. There were four children, all

going to finishing school, or private schools, or college, and practically all at the same time. They were all within just a few years of each other in age, and they were out of town quite a long time.

**BY MR. STEPHENS:**

Q. 55. Fred, to the best of your memory, when your mother made you these gifffts, did she speak of the grandchildren alone, or did she refer to you and to your needs and expenses?

A. I think she spoke of all of us, as a group.

Q. 56. Including yourself?

A. Including myself; yes.

FRANCES L. HOPPLE

**BY MR. STEPHENS:**

Q. 15. Now what was the nature of her relation with her son and her son's family?

A. Well, she was a most devoted mother. You would think that was all that amounted to in life, was her son and grandchldren, and her own family.

Q. 16. They lived right next door to one another.

A. Yes, they were in and out almost every day from their house.

Q. 17. Do you know anything about Mrs. Schaefer making her son certain gifts of Lunkenheimer stock from time to time?

A. Well, many years ago, she told me that she wanted to make her son independent, and he was raising a big family and she wanted to do it, and that she was going to give him some of her stock.

**BY MR. FORD:**

XQ. 3. You say many years ago she related to you that she wanted to make her son independent. Do you recall any further conversations at that time, of any further words or statements that were made with respect to what she intended by making him independent?

A. No, but other times, I have been down there later than that. Many years ago she said that, and then in between times when I have been down there, she has said at different times, that she wanted to give to her son to make him independent.

XQ. 6. Did she say at that time, how she intended to make him independent?

A. She was transferring some of her Lunkenheimer stock.

ELIZABETH LOEWENGUTH
**BY MR. STEPHENS:**

Q. 13. What were Mrs. Schaefer's relations with that family?

A. Oh, she was very fond of them; very fond of her grandchildren.

Q. 20. Now, Elizabeth, would she sometimes talk to you about her business?

A. Yes.

Q. 21. And about her financial affairs?

A. Yes, she did.

Q. 22. Did she ever mention to you what she did from time to time for her son, Fred?

A. Yes, she did, many times.

Q. 23. What did she say?

A. Well, one time she talked about it and she said 'I am making some gifts to my son; I want him to be independent, and I want him to enjoy it while I am still alive.' She wanted to see him to be happy, and also for his children's schooling, you know.

**BY MR. FORD:**

XQ. 2. Did Mrs. Schaefer consult with you as to these gifts, or would she just tell you in a conversational way after she had made them?

A. Yes, she just told me about it, you know. She wanted me to know, because she was very fond of me too, and she told me all of those things.

XQ. 3. Did she tell you before she made the gifts, or afterwards?

A. No, afterwards.

XQ. 4. She would tell you she made the gifts to her son because she wanted him to enjoy it while she was living?

A. Yes, to see him well provided for, and she was happy to do it."

Do the facts and circumstances existing at the time of each transfer, as set forth above, reveal the purpose of the donor to be to distribute or partially distribute her estate, or to do an act of generosity or kindness?

Significant in the record here is the testimony that donor expressed her purpose in making the gifts to be, to make her son independent. Motive for giving is limitless and conception of needs of individuals and families may be almost equally broad.

To a woman of donor's background and situation, independence to the son would include the means for all members

of his family to take their place in the life of their home community according to the pattern set by the donor. It included the conception of private schooling and higher education for his children. It is reasonable to infer that donor's conception of independence also comprehended a position of dignity and respect in the business and financial world for her only son, colored with a particular anxiety to preserve a knowledge of the affairs of and influence the voting power in the family business to herself and donee, as daughter and only grandson of the founder thereof. The gifts of the voting stock would so indicate. Considerations of mounting taxes and changing living conditions would further tend to show need for the gifts to accomplish her goal of independence for her son and explain her choice of capital assets as the subject of the gifts.

Remoteness in time of the gifts to her last will and death is a circumstance pointing away from contemplation of death.

Donor is quoted as saying she wanted her son independent and to enjoy the use of the property while she was still alive, which is in effect saying that she wanted to enjoy seeing him independent. Surely this is a motive connected with life and her own then present enjoyment and contains no thought of the effect of death on her whole estate. We observe here that it must clearly be possible to make substantial gifts iter vivos without contemplation of death. Nor can one give without it amounting to a partial distribution of one's estate should you choose that language to describe the transaction, but, certainly, it does not of necessity follow that any gift and consequent partial distribution is such a one inhibited by the statutes nor necessarily made to evade the tax.

In the Robinson case, the court stated at page 65 that the will was of persuasive effect in fixing the pattern of distribution and coupling the gifts involved thereto, and the same appears to be true of the Parker case. Such is not the case here and provides a clear distinction between the cases.

We, therefore, conclude that the facts and circumstances existing at the time of each of the various gifts, as shown by the record, coupled with the testimony as to motive, show the purpose of the donor was in the nature of doing acts of generosity, satisfying her conception of a need of independence for the donee and conferring a favor and expressing appreciation to a dutiful son: hence, the gifts can not be said to be in contemplation of death, and thus do not amount to a partial distribution of donor's estate. The Department of Taxation has, therefore, failed in sustaining the burden of proof that

the transfers were in fact made in contemplation of death, as defined by the Ohio statute.

The judgment of the Probate Court of Hamilton county is, therefore, sustained in excluding the first gift from the taxable estate, and reversed in part in including the five subsequent gifts in the taxable estate, and the cause is remanded to the Probate Court of Hamilton county, with instructions to determine the Ohio inheritance tax in accordance with the law and this opinion.

HILDEBRANT, P. J., MATTHEWS and ROSS, JJ., concur in syllabus, opinion and judgment.